and it came down to a question of whether any action that the university took could be found to be unreasonable. Well, she saw that. The court... The chair chancellor found that it was unreasonable whether the contract was ambiguous or not ambiguous. I think Judge Kennard, when Judge Kennard made that finding, she made that finding by, number one, not looking at the specifics of what went before her. Instead, what Judge Kennard did, she said, I expected the university to tell me other things. In other words, the university to prove, colloquially, it didn't breach. The burden is on a plaintiff to show, if you bring a contract action, the defendant breached. That's what they did not do. What they did is they enlisted testimony from various one current and two former fraternity members about what they thought would be the impact. But what was never... Not objected to that testimony on the basis that it rendered a lay opinion? Not on the opinion... Because there was an objection to Lance's, at least in the breach, to the testimony proffered by the university. There was, however, motions in Lemonade that were denied by the court that did address whether that was appropriate testimony, and Judge Kennard denied those motions. So what we had is we had a case... The standard of review here is abuse of discretion, is it, in the interpretation of the term unreasonable by the trial judge? The standard review with respect to that specific issue would be abuse of discretion. The standard of review with what we would suggest is really what the court needed to look at, is did the complaint even state a cause of action? A motion to dismiss, in other words, would be to no vote, because that would be as a matter of law. And here, this complaint, if we look at it and we hold it next to what Judge Kennard did at trial, there's no meshing. There's no matching. The complaint sought declarations about, is a contract enforceable? There was no issue there. It sought a declaration, could the fraternity designate? There was no issue there. It sought a declaration, could the IIT have this Greek move policy? Well, I think, you know, I see and I recognize what you're saying at this point. But supposing the university, instead of saying, you know, that they'll pay one semester's residency, would say they have to, since they're going to engage in the social activities of the Greek house, their grades will be limited to a C and no more. Or we will attach a larger fine that could not be regarded in any sense as being moderate. Would that not be a breach, even though technically the fraternity would still designate and the university would agree subject to the restrictions that it would impose, which are not restrictions that fully shut the door, but they certainly have the impact of narrowing the entrance? That would not be a breach. What that might is give rise to an action by the individual student against the university. Well, that would depend, again, on whom we would single out as being harmed. And it may very likely be that we have harm to a student which is not reachable, for which the plaintiff would not have standing because he doesn't represent the student, but that doesn't also preclude a concomitant injury to the fraternity itself. I think if we want to look at this in terms of what could be or what is, a better analogy I would submit is we know IIT is an educational institution. It's a university. We know from the cases from this court and other courts that courts do not involve themselves in the internal affairs of education of the university. But what I posit is this. If we take what Judge Kennard did and what the plaintiffs urged in this case, they say IIT essentially has no discretion to act except, they say, maybe on character. I posit to the court- Well, what about the 45 years of course of dealing where there was a free and unencumbered designation by the university of anyone that the fraternity sought to appoint, and suddenly in the midst of this course of dealing they begin to impose limitations which technically do not contravene the literal terms of the agreement, but they could certainly be deemed to constitute a kind of disruption or diversion of what the understanding would have been between the parties based on their course of dealing. First, that's not in the record. There's no record that it was unencumbered for the years you talk about. There is talk that the agreement was in 1964 and now we're in 2009. Secondly, the university is provided discretion, and as I've suggested, the university is an educational institution. What if it simply said to move out of our dorms, to not live at home, you must have at least a C average? Clearly an educational basis. Sounds like something the Jesuits do all of the time. Well, perhaps if we go to IIT's not a Jesuit university. If we listen to what Judge Kennard- And we had to live in the dorms and we had to be in by 1030. In this particular case, it seems, and I want to establish certain ground facts here, it seems there's no dispute that one freshman who were not commuters and not approved as being commuters had no choice but to enter into a resident hall agreement. Yes, that's right. Okay. So, then it means, in other words, that they have now, with the university's requirement that the student reimburse the resident hall fees before he's allowed to move to a Greek house. They are basically discouraged in a very meaningful manner that doesn't take really more than common sense. Any such move by that freshman during that time, it technically lets the commuter join. It also lets the student engage in other kinds of fraternity experiences. It gives back some increased rights to the fraternity, but those increased rights we're talking about as consideration are meaningless because they don't have consent. You can't simply offer consideration and say, this is what we're offering. You'd need an offer and an acceptance before consideration and acceptance. With respect to what you're talking about, it's the so-called 45 years of course of proceedings, that parole activity did not change the contract. If I agree with you I will pay you timely and for 45 years pay you in five days, that doesn't mean if I pay you in six days I breach. And they're suggesting that the contract was breached because a new contract was created by this parole activity. We sort of have to put in place what the implied covenant is. And since one of my cases has argued on that point, the Lennox case, I think I would like to clarify that the fact that you mortgage, you sign a purchase agreement for a house subject to obtaining a mortgage, and then you go out of your way either to reject the mortgage or to poison the well by calling the bank and telling them, you know, you're not a secure debtor, that this isn't a secure loan, that that, even though it leaves the contract intact, because you still haven't obtained the mortgage and the contract says there's no deal if you didn't get a mortgage, there's an implied covenant that you will not, when there's a condition preceding to the performance of the agreement, to take an initiative that lends the condition preceding not to be fulfilled. But that's not what occurred here. What the university did in its action in 2009, it was based on a variety of principled reasons. And if the court is going to, is there a reasonable action that was taken? The principled reasons that were established were, beginning, they were financial in nature. They were also principled reasons that Dr. Cram testified with respect to, that it should not be on the burden of a brand-new student to have to move into the dorm on day one. So that raises the question, whether this is in that faith, whether this is a breach of the implied covenant of good faith and fair dealing, what constitutes fair dealing? Is a legitimate interest of the university, even though it is antagonistic to the performance of an agreement, nevertheless, in good faith? And that raises the question that I started with. Who determines that and what's the standard? To quote maybe from the second district, not from this court, when they looked at that in the Amico case, which is not really cited in the briefs, but it's directly on what Your Honor is speaking of, whenever contractual discretion is given to a party, obviously that party will act in its own best interest. The question is, are its own best interests so antagonistic to the interests of other contracting parties that it's not in good faith? Here, by the university providing and putting forth specific rationale as to why it was doing it, I would submit to the court that that is not in bad faith. That is in good faith. It is not a breach of that implied covenant. What the trial court did is it turned that around. It said, university, you proved that you didn't act in bad faith. Not plaintiff, you proved to get your breach of contract action. They did. We cannot lose sight of the fact that there is no common law right here for this injunction. This injunction must rise or fall on the contract between the parties. Let's look at the language of the injunction for a moment. I've got it. It's in the appendix to your brief. The injunction entered on August 26th. Yes. Incidentally, this was entered on August 26th of 2009. But your Greek move policy was enunciated and announced when? Initially earlier in the year, I believe it was in February. In February. And then there was so-called back and forth that occurred. Okay, there were negotiations going on, back and forth and everything else. But every new freshman coming in who had to reside had already signed the contract. They received the housing contract before they arrived on campus, yes. Right. And presumably, they moved into those campus units, they had signed the contract. Yes. So you had a contract with these students. Yes. All right. It is well established that a hearing, according to our Supreme Court, that a motion for a preliminary injunction doesn't determine any factual issues. Now, as I recall, the trial judge said that whether the contract was ambiguous or unambiguous, your behavior was unreasonable under the contract. She made that statement, didn't she? Yes. A preliminary injunction is issued to preserve the status quo. Now, what was the status quo at the time that they filed their lawsuit? All of the contracts had been signed by the kids, right? Yes. And I think the court is correct that at that time, what had happened is there had already been the signings. What I believe Judge Kennard did is she went back to the signing before that and said, really I guess it would be the status quo ante, going backwards to try to turn the clock back, so to speak. In ruling on the motion for such relief, controverted facts on the merits of the case are not decided. I've read her oral pronouncement four times now. She made at least four decisions with respect to the posture you had in the case, it seems to me. She'd already decided the case before she entered the preliminary injunction. With reference to Judge Kennard, I believe you're correct, yes. I mean, I was trying to decide whether this was really a preliminary injunction or whether it was conducted as though it were going to be a permanent injunction. I think there is language in Judge Kennard's ruling that suggests that it's remarkably close, if not the permanent injunction. There are even some comments where she says that it's... I mean, did they leave you with any wiggle room at all going forward? I think from a technical basis, the judge said that, you know, maybe I'll hear other things, but the findings that were made based upon the case that was presented to her, the answer's really very little, Was the status quo maintained? I don't believe it was. I think the status quo was, as the court points out, the contracts were in place. In all fairness, in granting a preliminary injunction as opposed to a PRO, doesn't the court look at the likelihood of success?  I think it looks at the likelihood of success. So, in that sense, it can appraise what the leanings would be, actually. I think appraise is different than find, and I believe, as we've pointed out in our briefs, in looking at likelihood of success in the mirror, the things we've talked about this morning, the court should not have reached this even as an injunction, because there was no likelihood of success for the various reasons. With regard to this particular issue as to reasonability, did the university act in such a way that it breached the covenant as it relates to not withholding its designation unreasonably? I think there the court did make a specific finding that its actions did. The court went on to say, and I wanted to hear other evidence, and I didn't hear it, so I'm ruling against you, and therefore it switched the burden of proof to the defendant saying, you need to prove reasonability. In other words, saying in a breach of contract action, the defendant must prove that they did not breach versus the plaintiff proving they did breach. I would submit to the court that that was an inappropriate action. I must say that the record seems to be devoid of any articulation of the elements that would be considered in determining, in this context, what is reasonable and what is unreasonable. No one has, including, I'm forced to conclude it's the trial judge, did not outline or designate analytical factors that would be determinative of what is reasonable under the four corners of this agreement. I think the court is correct. The only place I would depart from the court in that is I believe that we presented to the court when we were required to put on evidence that we acted reasonably, principled reasons as to why we made the decision to go forward with the Greek move policy. So if we do look at this record, on the question of reasonability, the only evidence that's before the court at the trial level, or here, was the evidence presented by IIT demonstrating principled actions. Does that mean, and I saw that, I did see you say that in the brief, but does that mean that the university, after entering into this kind of agreement, could suddenly and abruptly change its academic standards to reverse from its pre-existing policies, and that is reasonable? In other words, under the four corners of this agreement, what are the parties really shooting for when they say that the university shall not unreasonably reject the designation of a fraternity? I might submit the argument could be made that this doesn't call for new academic considerations that are simply based on rethinking of old data, but at the very least would require the impact of new studies, you know, that come out and determine impact of fraternity life on first semester freshmen, or that they involve new exigencies. And I don't know why, for example, you're so gun-shy, and I say that non-pejoratively, about looking at the financial front. And we're not. That was what we presented at the trial level. You offered an opinion, a rather strong one, about your motives. She basically said this is all about money, and that's not right. You shouldn't keep these kids from going into the, it's simply in order for your, but that seems to me now that she's decided she's going to run the institution with respect to its fiscal policy. If they need these added tuition for the residency because of disturbed or changed economic factors, why wouldn't that enter into, why wouldn't that validate the reasonableness of the activity? And I think it does, and I think that's what we presented. What this is lacking analytically is definition. No one has really tried to define what the word reasonable means, and I suppose we have to revert to Potter Stewart's definition of pornography. You can't, you don't define it, but you know it when you see it. And maybe that's some of what we would go to. Clearly the contract does not have a definition. The purpose of a preliminary injunction is to maintain the status quo until all of the merits can be decided in a hearing for a permanent injunction. Then she should have made it clear that you would be able to continue your Greek policy and your requirement that, because you had already entered into these agreements with these kids. And I would go one step further. And the status quo was all of the kids are in resident dorms run by the university and they're paying tuition, and it's our policy that if they want to leave and go to a fraternity, they're going to have to pay for the whole semester. That's the status quo. I believe that's true. And I think the one step further, as we discussed, is that the financial reasons that were presented below and that are in the briefs are reasons that, although Judge Kennard foreclosed on her findings, saying essentially those are not reasonable to rely upon. Even so, even if she said that, the status quo would seem to be required that she leave the status quo as it is until she heard on the merits and then decided ultimately whether your policy was reasonable or whether you breached the contract. That's correct. And when she hears it on the merits, the merits should be able to include that the financial considerations, as well as the other considerations, make the actions of the university reasonable. What Judge Kennard did is she foreclosed that. What was the policy before this new policy was created? Was there a penalty for students that were admitted residentally? No. None whatsoever? There was none. Any kind of penalty? They were permitted to leave the dorm contracts and be able to go to the fraternity. But you just said there's no real record on that. There is no real record. I'm not going to argue that the status quo was what you did the previous year when you let the kids go. That's correct, of course. And you didn't impose a penalty. Yes, of course. Okay, that's going to be there. The status quo was the last, whatever the magic words are, rather than your implementation of the policy. But I think what we go back to is what the trial court heard was a case that was presented under a contract. And as the court points out, the contract only gave a very limited, if you will, obligation on IIT that they had to act reasonably if they were going to withhold the designation. Well, didn't she, in effect, conclude that it was unreasonable? Yes. To effectuate a policy where, for 45 years, any student that had a contract that wanted to move to a fraternity could then move. Would be released from it. Didn't she essentially find that that was? What Judge Pinard essentially found is that the reasons proffered by IIT, even though they didn't need to proffer the reasons or we didn't need to proffer the reasons, did not demonstrate that IIT acted reasonably in doing this so-called brief move policy. What the court should have done, I would submit, is the court should have looked at who's going to reach the question of an injunction. Has the plaintiff established that it's an unreasonable action? That didn't occur. We went further and we presented evidence that it was reasonable. It did focus on primarily the financial aspect. But she took umbrage. And she did. That's correct. And I don't think it takes probably even much evidence, because we live in the world, that finances are a big part of today's society, especially at the university level. Further, we did present evidence from Dr. Cram that specifically looked at other aspects. And because those other aspects go to the university experience, the educational experience, I believe it was also inappropriate for Judge Pinard to become involved from the courts running the institution. Well, they only become involved when there's some kind of action that they would consider arbitrary, unreasonable, capricious. And I think that's precisely where we need to focus. Well, isn't that what she was sort of concluding? Because let's just take, for example, I know there weren't individuals that were part of this. It was the fraternity. But the students that come to IIT that eventually end up leaving the dorm and going to the fraternity, they're approached, and it's not when they just get there that all of a sudden the fraternity is involved. Correct? The university, as part of the Greek move policy, was providing additional access, if you will, to students during orientation by the fraternity and other times. So this whole thing, though, this procedure had been going on for 45 years, where I'm sure those students were told that, you know what, even though you have a contract for the dorm, you can be released from that because that's how it's been done for the last 45 years. So what has been going on? And I'm not saying that that means that you can get an injunction. I'm saying that that was how it was operated. There was clearly some course of conduct over 45 years. And I don't suggest that that means you get a preliminary injunction in the chance report because there was this type of activity going on with fraternities. But we've used a new word which maybe gives us some insight into what is reasonable. We used the word, did the university act capriciously? Did the university act arbitrarily? And if we look at this record, even putting aside should the court have entertained an injunction at this point, the only evidence in the record is it did not act capriciously. It did not act arbitrarily. It acted for reasons of finance and otherwise. We can say we don't agree with the finances. We don't agree with the other reasons. Did the policy, let me ask you this, when these contracts for dormitories were signed, was there any provision in there that suggested you could be released? Or was it kind of a standard lease that you don't get released? It's the latter. It's the standard when you send your child to college. The provision was that you don't get to be released. They were being released. But the actual contract itself for the dorm was not. What was their irreparable harm argument? I mean, they must have made one. The irreparable harm is I understand it. It was an irreparable harm as it relates not to the loss of students, because that could be obviously addressed by money. If it became a money case, you don't have someone to live there, here's what it would cost to live there. It was the lessening of fraternal bonds. Now, the lessening of fraternal bonds, the way it was presented, it was not presented by people that didn't live in the house. We don't know what they have. It was presented by an alum from the 1950s, an alum from the 70s, and a fraternity. In the end, the deprivation of the fraternity experience for this one semester would irreparably harm the individual who would have had the opportunity to live in the fraternity house rather than in the dormitory. I'm curious about the ramification of the term irreparable harm. One is tempted viscerally to associate irreparable harm to grave harm, but that may not be the case under the law of contract. Irreparable harm may simply mean that whatever benefits the contract purports to provide cannot be adequately recompensed through a money judgment. But even if that benefit is a small one, is a luxury or a convenience, it may still constitute irreparable harm to the extent that a remedy at law won't give you the benefits of the bargain. But that wasn't what was presented here. What was presented here in the record is if there was any irreparable harm, and I would submit I don't believe there was, that irreparable harm would have laid upon the feet of the non-member who was denied the opportunity, using the fraternity as an example, to live in the house. There is nothing in the record, nor would I submit, nothing that the fraternity wants to put forward that says a brother who does not live in the house is not still a brother. A brother who doesn't live in the house but moves in second semester or second year isn't still a member. The harm would still be de minimis in the way you would have to characterize it. To the current members, there is no evidence that there is any harm to anyone that wasn't here. In other words, a non-member. And I submit, as we've already pointed out, the Fraternity Alumni Board has no right to represent those non-members whether they're harmed or not harmed. And I don't think they would be anyways. The only evidence is that whatever activities, whatever programs the fraternity had, they were equally available to all, in-house or out-of-house members. Before you sit down, you mentioned something in your brief for the first time and nothing happened. You said that this may be a terminable at-will agreement, in which event it can be re-modified at any time. But you, if I might characterize it from going back to my own days when I practiced law, you danced away from that very quickly. And probably for good reason, since the fraternity paid $200,000 for building this rehab, that might be an indication of greater purpose. I don't think that's the reason why. It is an argument that we did present in our briefs. This contract does not have a term. The only term that you could find in it would be the financing terms in terms of paying back various loans or notes.  Don't you look at the various factors? Let's say, I know in job hunting, did he leave one jurisdiction to go to another? Did he leave permanent employment? Wouldn't you look at the consideration here or at the background here where the board for the fraternity forked over the cost of the hunt, which they then deeded to the university? Yes and no. The reason I say yes and no, that has already occurred. There has already been the consideration, if you want to talk about consideration, of being able to live in it, to be able to maintain it, to be able to designate students. No, because there is no modification of the contract that IIT is urging or seeking. The contract is the contract. As we started out saying, IIT submits, it has all along, and continues to act under the contract reasonably with respect to assignment. It's not a question of rewriting anything. If we were trying to rewrite or change the contract, I think questions of consideration would come in, but they don't come in in this aspect. What we believe on behalf of IIT, what Judge Kennard did, is she foreclosed the reasonable, if you will, basis, the principled basis, as to why the Greek move policy was put in by simply saying, I reject it. That was improper because the test, as we pointed out, or as Judge McBride points out, maybe is, was it capricious, was it arbitrary? The only evidence is that it was not capricious, it was not arbitrary, but rather it was a principled action. And by having a principled action, there was no breach. Although IIT did not need to prove the absence of breach, certainly the plaintiff did not prove the presence of breach. Moreover, on top of this is, if there are any irreparable injuries, and I submit there really aren't, the irreparable injury is not an injury to the plaintiff in this case. It may be to those non-members that don't, if you use their logic, get the opportunity to move in immediately upon the beginning of first semester. That's not something that this plaintiff can redress. As a consequence, we believe, we would urge the court to reverse Judge Kennard's entry of the preliminary injunction. Thank you, Counsel. Thank you. Again, I'm Gregory Jordan. Mr. Jordan. That's correct, Gregory Jordan. Good morning, Mr. Jordan. I'm here on behalf of the Alumni Board of the Sigma Phi Alpha Psi fraternity. The Alumni Board is defined on page two of the agreement. Nobody is caught off of your standing to be here. No, the students and the alumni. There was a question that was asked. I found it peculiar that Counsel misstated the standard for the breach of the duty of good faith and fair dealing because he focused, he said, it's not arbitrary, it's not capricious. The standard for the breach of the duty of good faith and fair dealing includes acting in a manner inconsistent with the reasonable expectations of the parties. I think that they have been arbitrary. I think they have been capricious. Well, frankly, they certainly put it in more comprehensible terms, at least more comprehensible to myself, maybe not to the rest of the world. But I think that when you talk about the implied covenant of good faith and fair dealing, it means that the promisor will not do that, which defeats the agreement or exits out of the agreement through a back door. I would agree with that. In fact, particularly a party that has great discretion, if you look at the RTC case cited in the brief, and by the standard, a party with great discretion has that burden. Now, I found it particularly peculiar that in the reply brief, in the covenant of good faith and fair dealing portion, they said they don't have great discretion. But they did say it on page 21 of the first brief, which they said they had great discretion. And in the reply brief on page 12, they said they had great discretion. Now, I will point out that this whole argument with regard to the academic basis is really a canard. Because... No pun intended. No, and it's not a keenard. It is a canard. I'm sorry, but no pun intended, certainly. Because apparently a rich kid, academics don't matter. Because you can buy your way out of that. You pay $6,000, and they don't care a whit about those academic concerns. All they care about is you pay that room and board at $6,000. You have 18 kids. Now, I will tell you, 18 kids who joined, 18 young men, good young men, who joined the fraternity who didn't have to pay that $6,000. But I think, just as Kato pointed out, that is a substantial burden in this time. But if they had paid, if the status quo, which it was not having to do with the time and the Greek move policy... Well, that's what I... My only question was, what's the status quo going in? The status quo is the last peaceable relation between the parties. Because is the evidence... So that had to be, from your perspective, it was before the Greek move policy was adopted. It was August 6, 2009, when that policy was enacted, which is the exhibit... I'm sorry, I don't have the exhibit number, but that was... We had already protested that policy. Tell me, what do you suppose would be a reasonable refusal to accept the fraternity's designation under that agreement if you were to interpret it? If the individual that would be designated was not in the university's determination of appropriate character that would fit well within a fraternity. Because the fact that the fraternity agreement... Revisions or modifications or discretionary determinations by either of the promisors under that agreement, then shouldn't that provide a looser structure where one should not be looking to narrow the door, so to speak, to a... You might say it's not unreasonable to refuse a freshman who is on a waiting list and not admitted or who has problems, designated diagnostic problems that would require it. But rather that it lets the party, that the parties are friendly, that they have a cooperative spirit, and you're letting... You're giving them very loose reins. And the question is, are they abusing those reins by attempting to backtrack out of the basic values of the agreement? I mean, that would be the argument negating your narrow definition of what would be unreasonable. But it's their agreement. They, if you recall, escorted in the brief purgatory who graduated in 1958 and was a part of the negotiation of the 1964 agreement and testified, said that the university came and said, you have to sign this and you cannot change a comma. So the university is stuck with its agreement. Its standard is, if we designate, then they can let them in. The fact that these people had housing contracts, the entire time they've had other dormitories and they've had housing contracts and they've allowed these individuals, these young men, to get out of, to just say, fine. This is, if you recall from the agreement, this is a dormitory. The history of first semester freshmen moving into the fraternity house, I assume there is a history there dating back to 1964. 1949. 1949. I thought it was 1964. This agreement, this new house, was built in 1964. But the policy had predated that, too. It was just memorialized in this agreement. But you have a record, presumably, of what kind of a financial impact the change in the university's policy would have on the fraternity, would you not? I'm not sure. Assuming that you could prove a breach. That it was an unreasonable factor and you could say, well, instead of having 14 people come in last year, 14 freshmen, first semester freshmen, we had none. You could put a dollar amount on it. Absolutely not. You could never put a dollar amount on it. Why not? Don't they have a set amount of money that they pay when they move into the fraternity house? If we were in the real estate business, yes. If it mattered to us that we could pick up $108,000 or $90,000 or whatever, and if I did the math, 18 times 6, I think that's $108,000. If we were in the real estate business, yes. Short answer is you don't have an adequate remedy at law. The reason is because the guys who live there, it's a bond. I know. Okay. I figured that's where you were headed. I just wanted to see whether or not I could pin you down into arguing if you were going to go on a straight breach of contract, whether you could come up with a dollar amount as to how you've been injured. I suspect, counsel, that you could come up with a dollar amount. I suspect not. Because these are peculiar people because it doesn't matter. You can't get a guy who graduated in 1958 to care about an 18-year-old kid in any other context. These people. Who are we talking about? Are we talking about the kid or are we talking about the fraternity? We're talking about the members of the alumni board, which includes Phil Vittori, who graduated in 58, and it includes Bill Loudon, who graduated in 74, and it includes Josh James, who is a 2011 straight-A student right now at the university living in the SIGEP house. Is there a critical issue here which isn't part of the record, or maybe it is part of the record because I haven't traversed the entire record, with respect to when you do most of your rushing? We do most of our rushing in the fall. With the incoming students. And this really disrupts that for all of the fraternities and sororities. This was during rush week that we had these hearings. How is this moot? I know you argued that, but how is this moot after the court has preliminarily enjoined them from instituting this other policy that includes a penalty? Because we're going to have the only way. They can stop from doing what they want to do, and they want to enforce this policy. So how is it moot now? Because if you were to go back into your chambers and you were to write a one-page order saying, we think Judge Kennard was wrong. We reverse Judge Kennard. And then you went back to the university and said, all right, we don't reverse judges. We reverse orders. Excuse me. I'm sorry. You're right. You reverse the order. And then you went to the university and said, great move. On. And then there's not going to be any designations.  Well, I don't think a lot of transfer students come into universities in March. But if all of the fraternities and sororities are on an even playing field with respect and basically saying, incoming first semester freshmen are off limits for recruiting. That applies across the board, right? Except for those who live at home. Why wouldn't it just change your recruiting procedures? Instead of rushing everybody in September, you rush everybody in February. Well, because they don't give us that list. It's colder in February. They don't give us that list. Well, first off, people aren't even admitted. Well, could the university do that without this? I would think it would be privacy implications for them to give us this list of perspectives that applicants have. So could the university, if it so chose, have a policy where they said that from now on, no matter where you are or what fraternity you want to join, it's off limits for first semester freshmen? If they did that, they would be breaching the agreement. But at least they'd be more intellectually honest in what they did. But even if they did that right now, if you reverse the order, there's not going to be anything until it's filed. Forget the penalty. If they decided, wasn't there some testimony that maybe it's not such a great idea that the first semester freshmen, not second semester, but first semester freshmen live in the dorm, they can still participate in all of the activities of the fraternity? You mean you think there would be something totally unreasonable about a policy that the university would have for incoming freshmen? Yes. Because this is a housing decision. This is not a residency issue, too, is it not? I mean, who determines the residency policy at the university? The fraternities and sororities? Or the university? The university does until they contract with – you see, this is a unique situation. Tell me something else, and I'm switching gears here. Supposing the university incurs a financial crisis, not necessarily as mild or whatever as the one incurred by IIT, but there was data in the brief indicating that the endowment shrunk evidently significantly during this time. Supposing the university was on the verge of bankruptcy or having to give up certain faculties, and decides instead, No. Rather than that, we'll hang on to our housing tuitions for another semester, and this may help us through the crunch. Would you at this point say you can't do that because it's unreasonable or because it breaches the implied covenant of good faith? It breaches the contract. It doesn't breach the contract unless you say that the 35 years or so of pre-existing practice become part of the agreement. You can't say it breaches the agreement, and you have no law that tells us that course of dealing becomes part of the agreement. Right. The course of dealing allows for the interpretation of the party's actions. But if I said I was close to bankruptcy, and my financial situation has turned, and therefore I don't have to pay PNC Bank for my mortgage, because my financial situation has changed, and they say, No, we have a contract. And if you don't pay your mortgage, that's why that would be encompassed in the flexibility that the contract provides by saying we can't refuse unreasonably. And if we're on the verge of insolvency or bankruptcy, our refusal is not unreasonable. Well, even if that were the case, and I would disagree with it, there's no evidence that the IIT is on the verge of bankruptcy or... It's my hypothetical. Right. I'm just saying. And I control the facts. Very good. And I don't dispute that. But the fact is, is that the university, when the sun... When it was raining in 1964, and they really needed the SIGEVs... And, by the way, this does not affect all of the fraternities. It affects one... It's the only contract that exists between the university and a fraternity... I think there's at least one other one. There's probably at least one other one. But nobody else sued. What if the university adopted, at the time they adopted their Greek move policy, also said we hereby aggregate our obligations under all contracts in the past? If they... Well, are they not? If they're terminal with the fact that they would have to build us a new fraternity. Under session 15... They have to build you a new house? Yes. That would be one of the consequences of them terminating the contract. So that really is... From your perspective, they're really locked into this. No. No. They're not locked in. They can terminate it. They just have to go forward with their contractual obligations. I can't stop them from terminating. If they want to terminate it under session 15, they can, but they didn't. No. They just argued that their Greek move policy with respect to incoming freshmen was reasonable. Well, they said that, but they really didn't put anything forward other than the fact that... I understand. I understand. But that's really the crux of the issue. They said they didn't breach the contract. They just... Their provision, which requires incoming freshmen to live in dormitories run by the university and to sign contracts and not allow them to get out of those contracts without paying a full semester penalty. But that's reasonable. That's what they're saying. That's what they're saying. And so they didn't breach it. No. That's what they're saying. Right. But the fact is, is that 45 years, people have had these housing contracts. Right. And these people get designated and they get moved. And to get back to my point with regard to movedness, there's going to be a trial. This is not like the NRAA minor case. What was this preliminary injunction hearing all about then? This was about... You haven't had your trial yet. It sure sounds to me like she heard all kinds of evidence. She listened to testimony from both sides. She heard three witnesses on our side and two witnesses on their side. Okay.  What's left? What's left is... What's left? If we come out of the woodwork at a full-blown hearing, if we sustain this preliminary injunction and then you move naturally for a permanent injunction. I think we'll have... You'll have more witnesses and more testimony. More witnesses and more testimony and more evidence supporting the fraternal bonds. Well, basically, you felt really, really strongly that, you know, you did make your primary patient case. Yes. That this Greek move policy was a breach of the agreement. And you referred to the standard of review, and the standard of review is met there because it's... Was there an abuse of discretion? Generally, the standard of review for a preliminary injunction... Now, you're very resilient to make a primary patient case. Great. It raises a fair question. Yeah. The existence of the claimed rights and... And the evidence you offer with respect to irreparable harm was primarily non-monetary. It was... It was completely non-monetary. Brotherhood. This brotherhood concept. That they could be irreparably harmed. Supposing we found, we were to find, and I'm not at all saying we will, that the trial judge, as your opponents urge, switched the burden of proof there. That she seemed to be looking to the respondents to show that their actions were reasonable as opposed to looking to you to show that they were unreasonable, at least in the manner in which she discussed her decision, by commenting on what your opponent didn't produce. If you did that, I would be flummoxed. Because if a preliminary injunction hearing just provided that the plaintiff put on their case, then we'd have a different world. The plaintiff puts on their case, the defendant puts on their defense, and the judge rules. There is a burden. We have to make a prima facie case. And we have the burden of proof and the burden of production. But once we make our prima facie case, then the other side has to do something. Because if, in fact, they didn't have to put on any evidence, then the preliminary injunction hearing would be, all right, what the plaintiff does is he puts up three witnesses, and then they close the evidence and the judge decides. Well, I suppose the cautionary tale here is that in ruling on a preliminary injunction, it behooves the trial judge to be rather precise in terms of focusing on the requirements of a preliminary injunction. There's a lot of hortatory remarks being made in this particular ruling that I found rather difficult to follow at times. I just think the evidence was so overwhelming that she was taken. And she even said that it wasn't a closed case. I know. She even said that at this stage. I think it was fine because that was just those three witnesses and those two witnesses. What did the witnesses for the Illinois Institute say, if you summed it up in a nutshell? Not much. What they said was Dr. Cram came out and talked about the financial problems, and then he provided good service about the financial issues. Did you get a sense from the cold record that there was a feeling on the part of the court that for them to stress financial issues as being a basis for reasonable behavior was somehow improper? No, I think that she didn't feel like they did a good job of explaining what these financial problems were. Well, basically, she said it's all about money. What else did they say? Wasn't there something about freshmen not making these decisions to live off campus? Was there any testimony? I think Dr. Cram talked about the fact that these freshman kids were coming on. It's a whole new world, and it's a tough thing for them to do. What's arbitrary, unreasonable, or capricious about that statement? She also offered some anecdotal information about her own college experiences. What the devil was that doing in the order? I have no idea. But the thing is that I recall reading something about the fact that children today are not as respectful of their parents as they used to be and that society is going down, and that article was written in 1909. Well, the same thing with these freshmen in 1964 coming into this new experience and having to make this destination in the fall, and in 65 and 66, and of course, I could go all the way through 2009. It is arbitrary and capricious to think that somehow the world is different for kids now than it was in 64 or where it was in 1967 when I went there. Well, there is a difference because in the 60s, the whole Greek culture was under vicious attack, and that's been rehabilitated. I mean, this is extraneous, anything I say, but my own memory takes me back to the 60s where, you know, with the Kent State ordeal and so on, where fraternities and sororities were very much on the defensive. That rift, I think, was healed very substantially. But obviously, these cultural vicissitudes are very much in the works. Bill Loudon, who was a 1974 graduate, said pretty much the same thing. He talked about the fact that fraternities were not favored at the time, but he also talked about how valuable the fraternal experience was to him, and, you know, that's what we had to go on. But importantly, in terms of his maturity level and in terms of his ability to deal with life as a freshman sitting in August and September, there's no real functional difference between Bill Loudon matriculating in 1970 and a young man matriculating in 2009, and that's what Dr. Krams was saying, and I think that is arbitrary. I think everyone always thinks that life is different and that the world is harder today than it always was, and I bet you if you went back to Moses, Moses would have said the same thing. Anything else? I just want to make, just to clarify my point, there will be a trial, and whether one thinks that there's going to be necessity for a trial or not, I think there is. And the standard that is articulated- Could you go ahead with the trial? If it may impact on our result, I think the trial court has to wait, doesn't it? Isn't there a divestiture of jurisdiction once it comes up on the field with respect to entering any orders that will impact on one? Well, it's a 307 appeal. It stays everything. But assuming that your honors were to make their decision in overturning the order, the only exception, because the designations have all been made for this year, and presumably we'll have a trial shortly after whatever decision came out of here, that the fact is that the criterion set forth for the exception by the Supreme Court is that the challenge to action is in the duration too short to be fully litigated prior to secession. And whatever we do here, it will be fully litigated prior to secession, unlike the in re a minor and the other things where those were boxed up and completed and put on the shelf. This one here, you're going to, no doubt, make your decisions, but then with the guidance from your honors, Judge Kennard will be able to make that determination. So that exception to the mootness doctrine, which there's only two, and the private interest exception does certainly isn't applied. But that exception, they haven't attempted to and cannot meet the first element. Well, keeping in mind the fact that the contract existed and we're stressing and focusing on the word the reasonable behavior of the university and interpreting it, if they make a decision that can be shown to be partly academic and partly monetary, is there any merit to their argument that courts ought to stay out of the business of second-guessing university academic policies? We tend to keep our hands off hospital administration decisions, as you know. I think there would be no... Is there something comparable here we ought to be taking into consideration? I mean, this is a private university. I mean, if they decide that they want to make all of their students go to mass on Friday, the Jesuits used to do that, and nobody ever gave any sort of injunction against Wyoling University, I mean, some of us wanted them to do it. We would have loved to have an injunction prohibiting them from making us go to church on Friday. But it was a private university, and when you agree to go to the private university, you agree to abide by their rules. Now, if they had decided that academically it's best for freshmen to live in a dormitory without the influence of all of the social impact that fraternities have on their lives, and they make that as an academic decision, do we have any business getting involved in intruding upon that? I don't... First of all, that would be a hypothetical... No, no. You raise this issue of hands-off with respect to academic decisions. There's no academic decision here, because you can buy your way out of it. But second, if there were... You're saying housing has nothing to do with the educational experience at all? I would say that the evidence shown in the trial would indicate that we... We as a fraternity do a better job in preparing, through the Balanced Man Program, do a better job of preparing these young men for the college and life experience than the university does. Should the courts get involved in making the decision as to which one of you is doing the better job? I think that the housing decision is not an academic decision. I don't think that housing has anything... Any more than if the university said, You know what? We think that Coca-Cola is better for you in terms of your ability to process thought than Pepsi, and it has nothing to do with the fact that Pepsi is paying us twice as much as Coke does. Well, I think that a lot of people disagree with you about whether housing has anything to do with the education of a college student. What about the underlying implication that no one disagrees, that the university is perfectly within the latitude of its discretionary responsibility to forbid off-campus housing for freshmen? That's what the fraternities thrive on, the fact that they're in-campus housing alternate to the university dormitory. So no one is going to dispute that it's within the academic discretion to determine that freshmen should not be living off-campus. So how can you then say that when they further determine that it may be better for them to live in dorms rather than in the Greek houses, that that's not a part of their academics? I have no reason to believe that making people live in the dormitories necessarily has anything to do, as opposed to off-campus, has anything to do with academics. More importantly, that would be a finding of fact that the trial court should be determining, as opposed to the appellate court. And I think that having people living in your dormitories and providing you with money is a financial component. But to say the way... It's not within their broader range of responsibility in the fact that they're entrusted with people who are just a shred beyond their adolescence, who leave home for the first time to determine where their living quarters should be. Isn't that part of the academic responsibility? Or is the academic responsibility limited to determining which physics course to take or which survey course to take? I think the academic portion of it is the physics course. I think there's a social element of the college experience. I think that the Illinois Institute of Technology entered in a contract with the Sigma Phi Epsilon alumni board because they knew that we did a pretty darn good job of providing that social need. In fact, it says that in the agreement. If you look on the first page in the second recital, it talks about how it's beneficial to their educational experience. So now what we're doing in the appellate court is we're saying, we really should decide we can read... Perhaps we shouldn't. Perhaps we should leave those determinations to the university. As opposed to the trial judge. This started at the trial level. We're just reviewing whether the action in the order is supported by the evidence and the complaints that you filed. But you would have to make a factual determination as to whether... Courts don't get involved in these kinds of situations. The factual determination initially has to be whether or not the contract was breached, it seems to me. Once you have a determination that the contract was in fact breached, you make that determination. Then you have to decide whether or not there is no adequate remedy in law for that breach. Without a breach of that agreement, you're going nowhere. Wouldn't you agree? Absolutely. If it can be determined that you have an adequate remedy in law in response to that breach... Then I'd be out of luck. You're out of luck on that, too. But the problem I've had with the trial court's discourse with respect to the ruling is that she didn't seem to either focus on A, a breach, and B, whether or not there was an inadequate remedy in law. There was a lot of chatter, but I didn't hear anything precise enough to give me any confidence that there was a specific ruling here that all of the requirements of a preliminary injunction were met. But that's just one man's opinion, and there are three of us up here, and one of them is a woman. A very able woman. I wouldn't go there with a ten-foot pole. It's our own little ten-foot pole. Just because of our question, this was a very interesting case, and don't really, because we're playing devil's advocate to both sides, don't assume that we've made any kind of judgment about this one way or the other. I've made it a point that when someone leaves oral argument that they should have no way of knowing where we're going. Well, I have no idea. I thank you very much for providing us with the opportunity to present our position today.  Thank you. A final word. Very briefly. Very briefly. With specific respect to what the court was just discussing, is housing part of the educational program? This agreement, I think, unequivocally establishes between the parties, and it was in the record, it does. The recitals of the agreement specifically talk about the construction of housing on the IIT campus is, quote, congenial environment and working conditions conducive to encourage and inspire the intensive study required for a thorough education. The institute deems it in furtherance of its fundamental objective as an educational and scientific institution to include in its general student housing program the building and ownership of various buildings, dormitories, and the like. Housing is part of the college experience. It's part of the education. And I submit that the court is correct when it points out that the trial court inserted itself within the operations of the university when it should not have. But the question really is whether this insertion, at least at some level it is, was that this pronouncement of policy was sincere, as opposed to being cosmetic. And as to that, the 35 years of preexisting experience, with no determination that there have been additional studies drawn, to suddenly abruptly change the academic policy is not a question of our second-guessing the academic policy, but for us to second-guess perhaps, if at all, whether that is cosmetic or whether that is a sincere academic evaluation. And what the record below showed is that it was sincere. It was principled. There is evidence in the record of, as the courts pointed out, the reduction in the endowment by a third, the finances. The finances did play a very large part, and that is a principled reason to have this. There is the additional record that the court points out that is on the record, where Dr. Cram testified about the unfairness, the refusal to have a student, the day they come on campus essentially, have to make another decision about where they go. Is there also an adequate remedy? The court asked that question. Counsel said they couldn't find one. So if we have reference to the complaint in the case in paragraph 21, they specifically say the change will deprive the fraternity of approximately 14 students, although the number has been traditionally higher, with a loss of 8,500 per student. They then go on to say, and the loss of those relationships of those 14 students with the fraternity, those are the non-members. Counsel summed it up best when he talked about the rich kid maybe could get into the fraternity. The rich kid, to use his terms, is not represented by this association. If there's any claim, it's by non-members. But even there, I submit there is no claim because the evidence below established that if you're a member, you would have all of the rights to the balanced man program they talked about, which is a wonderful program. But if these fraternities find that part of their raison d'etre, their reason for being, is to reach out to students at all levels, then if they're relegated to rich kids, they are frustrated in their partisan function. But they're not because they can still reach out, and the record is that anyone can be a member. You don't have to live in the house. Unless they are telling us, and I would submit, and this is I know outside the record as someone who's in a fraternity myself, whether you live in a fraternity or not, you're just as much a brother. The bonds are just as strong. I object. Well, there's no jury. There's no jury here. It's just as the court pointed out, I think we can recognize, and the record was very clear that everything you have if you live in the house or you live outside the house is available to a member. What we have here is an injunction that was entered, and the predicate, as I pointed out, is not common law. It's that contract, and there is no breach of the contract because IIT acted within its rights reasonably. It didn't actually withhold any designations, but it acted reasonably by passing this policy, and the policy is principled. It's not arbitrary. It's not capricious, and as a consequence of that, I submit that Judge Kennard's order for the plenary injunction should be reversed. Counsel, thank you both. The case was very well argued, and we appreciate the amount of energy that you put into this case. The case will be taken under advisement.